May it please this Honorable Court. Richard Bach is my name. I represented Mr. Fries since May 13th of 2011. I tried the case in front of the Honorable Judge Jorgensen, done the appeal. So I would first like to start with the subject matter jurisdiction with the Court's permission. The case is a violation of the use of a chemical weapon. And the District Court held that the treaty power of the United States vested jurisdiction, subject matter jurisdiction in this case. And the defense challenged the statute as applied to this defendant in multiple pre-trial sessions. If the law is invalid as applied to the criminal defendant's conduct, the defendant is titled to go free. As this Honorable Court knows very well, the bond case was argued in front of the United States Supreme Court, I believe on November 5th of 2013. And they have not yet ruled with a decision. So ‑‑ Counsel, do you think it would be prudent for us to defer resolution of this case until the Supreme Court has made its ruling? Yes. And I actually put that in my brief. Because I put it in my brief that we felt maybe that the Supreme Court might rule by June. And so I do think that that's a seminal issue. And obviously, whatever happens at the Supreme Court regarding the treaty power and whether or not the treaty power embraces disputes between private and public entities, I don't know. In the case that I tried, it was a ‑‑ my client, the defendant, was a businessman. And as the Court may well know, this whole conduct that was claimed by the government involved a $200 bounce check. Counsel, let me interrupt. I'm sorry? In terms of deferring, everybody is here at the party. The Supreme Court may very well not reach the issue that's before us on the treaty power. And even if it does, there are alternatives, the Commerce Clause basis for jurisdiction. I would just suggest that there would be no reason to defer our decision. Of course, if our decision is ultimately based upon the Third Circuit decision in bond and that's reversed, that, of course, would cause us to have to take a change. But everything else is still before us. And I know you're from the Third Circuit. But the argument in front of the Supreme Court really was focused on that one issue, the treaty power. There was no other arguments. The government in front of the United States Supreme Court attempted to argue the interstate commerce. And Justice Scalia said, well, you never brought that up to the government. So I think the issue, the seminal issue in front of the United States Supreme Court is the treaty power, with all due respect, Your Honor. And the other thing is, as to the interstate commerce, the government in their brief says that this honorable court can go ahead and make a ruling on the interstate commerce grounds. But there was no finding by the district court. And what I appealed was from the treaty power. So there is the district court judge never said that there was a interstate commerce nexus. And you do that because it's a legal issue? Would the district court have to rule on that point before we could decide it? Well, we argued when I filed the motion, the motion was based upon our position that there was no interstate commerce involved in this case. And then the court went ahead, the district court judge, and said it's the statute is constitutional pursuant to the federal government's treaty power. That's document 159. No, but I guess the question that we're wrestling with is procedurally, what's before us to decide? It seems to me that if the district court never ruled on the issue and the case proceeded on the treaty power authority, I don't know procedurally how we would send this case back to the district court now that we have a conviction and a sentence. And ask the district court to give us an opinion on the Commerce Clause issue. Well, I don't know the answer. I don't know because the treaty power is what we appealed on. Because that was the ruling from the court. But we can affirm on any ground supported by the record, and the government is clearly arguing the Commerce Clause issue, even though you would prefer to talk about the treaty power issue. Well, it was a silent record as to the Commerce Clause from the court. But if the court wishes the Commerce Clause, we feel strongly that this is not a Commerce Clause case. This was a dispute between, unfortunately, between private individuals at a private residence. And there was nothing to do with interstate commerce. It had nothing to do like the bond case with, and they didn't argue the Commerce Clause in the bond case, but the bond case was things were sent through the mail. So there was a Commerce Clause nexus in the bond case. So I would, on behalf of my client, Well, actually the statute itself is even broader than that. I mean, the jurisdictional hook is that the act takes place in the United States, right? All right. I know that. But that seems just to be a, to set up the more specific sections. And if that was the case, if it just happened in the United States, and that was the proverbial game, set, and match, why is this case in front of the United States Supreme Court? All they have to do is say, this happened in, the bond happened in Philadelphia or the Philadelphia area. We don't even have to mention anything about the treaty power. So you have to, I believe, it has to be as applied. And I believe that the treaty power is, again, a situation, a very interesting situation. I've tried a lot of cases, but I've never tried one of these chemical cases before. It's a very unusual case for us as well. Now, the next quick argument that I would like to discuss with the Court is the jury instruction regarding the fact that the phone call that was purportedly made by my client on August 4th to the FBI, that was not recorded. But counsel, your theory that you're entitled to a missing evidence instruction is missing a predicate. And that is that the government actually had the evidence in its possession. The argument you're making could be made in any case where the government is seeking to introduce evidence of an out-of-court statement, say a co-conspirator statement, that could have been recorded but wasn't. That's not missing evidence as we understand the term, unless I don't understand the rules of evidence. Well, the Sevilla case that I cited at 714 Fed Third 1168 had to do with an automobile, I believe, and that just pictures were taken and the automobile was not available. But here's a phone call that's the whole basis of count two, this phone call. And the question is, did it materially, this is a non-constitutional error, but the question is, did the absence of this phone call materially affect the verdict on count two? And the basis of the argument really is that the evidence that was introduced was not the best evidence that should have been available. The evidence was introduced through the testimony of the FBI agent that took the call, who testified and was subject to cross-examination before the jury, and the statements that were ascribed to Mr. Frye were admissible under the statements against penal interest admissions exception to the hearsay rule. That doesn't mean that the evidence was inadmissible. It's just that if the FBI recorder had been working correctly and if the agent had realized that, he would have had even better evidence to corroborate what he testified to and wrote in his report. I just don't see that that's missing evidence. Maybe I'm misunderstanding your argument. I've never heard this argument made in quite the way you're trying to. Well, count, the basis of count two was that the FBI was materially misled by the. But our case law says they don't have to be misled in order to find an attempted obstruction. Your client was engaged in other things besides calling the FBI, you know, leaving these stolen identification, basically trying to throw all the investigators off. That's also obstructed count. Then if with the court's permission, I'd like to talk about the statement from one of the workers. I was in the sixth or seventh day of trial on this case. And one of the coworkers for Mr. Freeze was a fellow by the name of Montiel. And he was a witness for the government. And then the government put him on. And there were a number of questions regarding conduct that Montiel observed with respect to a fellow by the name of Jordan. And Jordan was a person that was supposedly with my client at the time they did this event on August the second. So I started to object. And the transcripts are in the in the excerpt of record on pages 68 through 70 and 71 through 75. First on the 927, I objected twice. And then on the next day, I objected four different times. And what happened was that Jordan was listed as a witness. He was going to be with the main witness, one of the main witnesses for the government. Jordan goes ahead and takes a plea agreement to misprison of a felony. And Jordan at the time of his change of plea says, well, there were three of us. There was Freeze, Goetsch, and myself that did the chemical event on August the second. Well, then Jordan comes back with his attorney later and says, I misstated that. Goetsch wasn't there. So now they have someone that basically has committed perjury under oath. So the government then decides, well, I'm not going to use Jordan. But they use Montiel to talk about Jordan. And one of the things that happened is two days after the event, the Montiel is looking at a newspaper and says, did they say anything when you provided the paper to Mr. Goetsch and Mr. Jordan? This would be the paper having to do with the article, because it was a big cloud that walked over Tucson National, which is a golf course on the north side of town, Tucson. And then he says, I told them, take a look at this, and they both looked at each other and smirked. I objected to that. So my position in front of this honorable court is, one, that the conspiracy had ended, so it's no longer in furtherance of the conspiracy, and, two, it's hearsay by conduct. And, three, if it's just banter, then that shouldn't come in either. But I thought that was damaging. And it allowed them to get in basically conduct that is suggestive that Jordan and my client were present. I thought there was another attack after August. Wasn't there one in April? That was the search warrant situation, where there was in April, where there was a woman by the name of Mrs. Brown. Let me just finish my question. Oh, I'm sorry. You said the conspiracy had ended, but I thought that the conspiracy encompassed all three, and that the government was arguing that these were all acts in furtherance and constituted a continuity. Well, that's a good question, because they tried to use that. That other act evidence never came in, because there was really no connection. There was no fingerprints. There was no physical evidence. So the court said no evidence can come in as to the claim that Mrs. Brown's vehicle had the windshield wipers glued and something was poured down her tank, because she was disgruntled as a result of my client's work on her, I believe, her driveway. So the jury didn't hear anything about that? No, no, none of that came in. Now, I only have like five minutes left, so I'll talk about the search warrant in a minute. And if then I could reserve four minutes with your permission. On the search warrant, we raised a couple issues. One was staleness, which had to do with the length of time between the execution of the warrant and the event of August 2nd. The warrant was he's indicted on May the 11th of 2012, and the warrant's executed the next day. Now, the nature of the case, very quickly, that the government touts is that the case, the situation is not stale. And they cite drug and child pornography cases. A very quickly interesting issue is as to the business search, because the search was of his vehicles, of his computer. And then they claim that he had the business out of his house. He has trucks out of his house. And then they claim that there was ongoing criminal activity in the warrant, which is this situation you alluded to in 2011. But there was never any 404B evidence that came in. I thought the district court adopted the report and recommendation of the magistrate judge and concluded that the government had shown that this was a pattern of activity. Right. That's correct. Okay. Right. And that's a factual finding? That was a finding. To which we would have to defer unless it's clearly erroneous? Well, I just would say to the court that there's no showing that that was related to the case in chief. It was never charged as a crime. But the district court cited to common modus operandi, did she not? And then they made a finding that there were sufficient facts to establish him off. I understand. And then the last thing very quickly is over breath. And I would, because I only have like three minutes left, I would ask just to rely on my brief with your permission. Sure. Thank you, then. Okay. May it please the Court. Peter Saks for the United States. I want to begin by briefly touching on the search warrant issue. Just the government relied on United States v. GAN. It stands for the proposition that if there's a continuing pattern or other good reasons that the evidence is likely to be found at the location, then the search warrant would not be stale. And here we have both. There's the continuing pattern alluded to by the or discussed by the district court. And also the other good reasons, if you look at the brief or the supplemental record, pages 20 and 21, it references three former employees of the defendant who all say things about how he would stockpile things at his house. Confidential source number one says that Freeze will stockpile buckets, used oil, feces, and dead animals at his house for future attacks. Confidential source two says Freeze will stockpile items at his residence to be used for future attacks. And the third confidential source talks about chlorine tablets that Freeze collects along with dead animals and that he doesn't use the chlorine tablets for his work purposes. Regarding jurisdiction, the government relies on Missouri v. Holland, as did the Third Circuit in the Bond case. The government disagrees with defendants' characterization of the case as a private dispute involving private property. When we look at the facts here, with a chlorine gas pile that was described as being about 1,000 feet long, 100 feet high, and 200 feet wide, that traveled three and a half miles over suburban Tucson, that's really no longer a private dispute. We had road closures. We had other people that were impacted, first responders, other residents. Counsel, I believe in Bond the precise chemicals were listed in the treaty. Is that the case here, or the Mr. Freeze Fry's chemicals listed in the treaty? I don't believe, or I don't know whether chlorine gas is listed in the treaty, but it has an extensive history as being used as a chemical weapon. It was used pervasively in World War I. It was used as recently as 2007 by insurgents in Iraq who attached it to explosives. So I don't think there's a real dispute as to whether the Chemical Weapons Treaty is meant to cover chlorine gas. Would you wish to comment on my suggestion, which the appellant takes issue with, and are there ways the Supreme Court could decide Bond without reaching the issue that we have? It's possible that they don't address the Commerce Clause issue. It was argued. Not the Commerce Clause, but in the treaty issue, that they might possibly find a way not to reach that issue. Sure, they could just apply it to the facts of Bond and leave us guessing as to whether it would apply here. But it's hard to imagine a situation where this law could be effective but not apply to an attack like this. So you agree we should vacate submission and await Bond or no? That's up to the court, obviously. The government really doesn't have a position as to whether you want to wait until the Supreme Court weighs in. The problem is that if we don't, then we issue an opinion and the Supreme Court surprises us in Bond and then counsel is going to have to come in, maybe either or both sides are going to have to come in with a petition for rehearing or a petition for rehearing in Bank or if it's later than that, ask us to recall the mandate. It's a whole lot easier to just, if we expect a decision by June to, you know, it's February now, we're not asking folks to wait more than a few months.  Does the panel have any questions about the admission of the statement about Mr. Montiel regarding his manager, Mr. Jordan? I do have a question. First of all, we have the Leighton case and we have the fact that the statements by a  smirk are in furtherance, et cetera, but how do you argue that a smirk is a statement in furtherance of this conspiracy? I don't believe we would argue that. That would just not be hearsay. It's just the conduct that was observed and testified about. Regardless, this would be a harmless error given the mountain of evidence against the manager. I understand the harmless position, but it really was hard to see that a smirk is in furtherance. And just one other note to supplement to the Leighton opinion, that in the commentary to the rules, the 1974 amendment to 801D2E in the commentary discusses essentially the same thing, that the smirk is a statement in furtherance of the Leighton case. And I think that's a good way to hold it from Leighton in a proving language. Any other questions from the panel? I don't know anything else. I think not. Mr. Bach, I think you had a little bit of time reserved, just about three minutes. Thank you. First of all, just to go back to the Bond case very briefly, the second issue in front of the Supreme Court was whether the provisions of the Chemical Weapons Convention Implementation Act, 18 U.S.C. 229, can be interpreted not to reach ordinary poisoning cases, which have been adequately handled by state and local authorities since the framing. Do you think this was an ordinary state criminal case? Well, I think that there is a state court provision in under our state court under Title 13 of our Arizona revised statutes that can embrace a claim that someone has done something like this. I don't think it's extraordinary. Generally when you say ordinary, that means run of the mill, something that takes place every day. Are there cases in the precedent of Arizona that can inform us whether or not these kinds of cases are routinely prosecuted in the Arizona courts? Well, they're saying, they're talking about the Bond case, and they're saying if that's ordinary poisoning. That wasn't really an ordinary poisoning case. She sent his stuff through the mail, and if it gets on somebody's doorknob or something, then it's fatal. So, and it just said to me. But I think Judge Rendell also said in her concurring opinion, we would have had a very different case here if those were in New York City. So the question I think Judge Rawlinson is asking is a very good one. I had forgotten that chlorine gas was used as a weapon of war in World War I, but that's absolutely right. And here we have a cloud of gas that endangers not only the first responders who are exposed to it, but an entire nation. That's a pretty unusual state court case when you're talking about exposing that many people to a toxic agent. Well, it just says that the Supreme Court, it says, in order to avoid the difficult concept of questions involving the scope of and continuing vitality of the court's decision in Missouri v. Holland. Very briefly on the Commerce Clause, just, again, just to go back to that, I just want to point out that I would respectfully suggest that that really is not right for review. And there's really no substantial basis in the record regarding a Commerce Clause argument. That's all I have.
judges: Garbis, Tallman, Rawlinson